## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>Samsung Laptop Computer, S/N:<br>ZX5293PB900371F; Apple iPhone, S/N:<br>C39GLAA3DTDT, IMEI: 013008002019469;<br>Seventeen Loose SIM Cards | Misc. No. |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kristina Eyler, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a warrant to search the following items known as a Samsung Laptop

Computer, S/N: ZX5293PB900371F; Apple iPhone, S/N: C39GLAA3DTDT, IMEI:

013008002019469; and Seventeen Loose SIM Cards further described in Attachment A

(collectively "PARK Incident-to-Arrest Media Devices") for the things described in Attachment

B.

1.       I am a Special Agent with Homeland Security Investigations ("HSI") and have

been so employed since 2003.  I am currently assigned to the Northern Virginia-Washington,

D.C. Internet Crimes Against Children ("ICAC") task force.  I have earned a Bachelor of Science

degree in the field of criminal justice/psychology.  I also graduated from the Federal Law

Enforcement Training Center's Police Mixed Basic Training Program, Prince William County

Police Criminal Justice Academy, Federal Law Enforcement Training Center's Criminal

Investigator Training Program and the Immigration and Customs Enforcement Special Agent

Training Program. I have received training from the Federal Law Enforcement Training Center and other law enforcement agencies in the areas of child pornography investigations and pedophile behavior.  As part of my current duties as an HSI agent, I investigate criminal violations relating to child exploitation, including violations pertaining to United States citizens who travel in foreign commerce and engage in the illicit sexual conduct with another person, outside the jurisdiction of any particular state or district of the United States but within the extraterritorial jurisdiction of the United States and, therefore pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia.

2.     This affidavit is submitted in support of an application for search warrants for the PARK Incident-to-Arrest Media Devices, one or more of which is described in Attachment A, for contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States Code § 2251(a), (c), and (e) (production and attempted production of child pornography); 18 U.S.C. § 2252(a)(1) and (b)(1) (transportation of a visual depiction of a minor engaged in sexually explicit conduct); 18 U.S.C. § 2252(a)(4)(B) (possession of a visual depiction of a minor engaged in sexually explicit conduct); and 18 U.S.C. § 2423(c) and (e) (engaging and attempting to engage in illicit sexual conduct in foreign places).  With regard to Section 2423, it is worth noting that a May 2015 amendment to the statute added the production of child pornography to the definition of "illicit sexual conduct".

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Moreover, I have learned some of the information set forth below through my review of the case-related documents, as well as through communications with other law enforcement officials.

## **PROBABLE CAUSE**

4.      On or about December 10, 2015, I received information in an e-mail from HSI Special Agent (SA) David Goldman, who is stationed in Bangkok Thailand, regarding Joseph Ricky PARK, also known as Joseph DEMASI, a U.S. citizen who is a convicted child sex offender who was then residing in Thailand.   HSI has been assisting the Anti-Trafficking in Persons Division, as well as the Royal Thai Police Immigration Bureau, in the investigation of PARK since his arrival in Thailand on October 22, 2015.  Prior to PARK's arrival in Thailand, he was residing in Vietnam.

5.      Investigation into PARK by HSI and other law enforcement entities revealed the following:

   a.  PARK was convicted in Connecticut in 1987 for Risk of Injury to a Child and Sexual Assault 2nd Degree and was sentenced to 10 years' incarceration, suspended after 7 years, and 5 years' probation.

   b.  In 2002, law enforcement agents in New York received information from a cooperating defendant who stated that PARK had sexually abused multiple children in Mexico during the 1990s.

3

c.  In March 2003, PARK travelled from the United States to Cuba, where he was arrested for Attempted Corruption of a Minor.

d.  In April 2003, while incarcerated in Cuba, PARK engaged in correspondence with an individual who was later convicted of charges related to child pornography and travelling with the intent to engage in illicit sexual activity with minors.

e.  In January 2009, South Korean authorities revoked PARK's visa and ordered him to leave the country after learning of his prior sex abuse conviction and receiving information that he displayed indecent behavior while working as a schoolteacher in South Korea.

f.  After departing South Korea in January 2009, PARK attempted to re-enter the country in February 2009 and was arrested.  Later that month, PARK was voluntarily removed to the Philippines.

g.  In September 2012, PARK applied for additional visa pages for his U.S. passport, stating that he planned to travel for an indefinite period of time to, among other places, Vietnam.

h.  In November 2015, following the events described below, PARK was deported from Vietnam to Thailand.

6.     PARK's deportation from Thailand occurred after, in February 2012, the United States Department of State received a report from a Vietnamese citizen that PARK was

suspected of engaging in illicit sexual conduct with a Vietnamese juvenile (hereafter referred to as "VICTIM") within the city of Hanoi, Vietnam.  The VICTIM was reported to be 11 years of age at the time of the incident.

7.      As part of the report, a copy of the alleged perpetrator's business card was provided to the U.S. Embassy.  The business card contained the following contact information: Dr. Rick Park, Teacher of English from New York, English classes for children, teens, adults, university students, and businessmen, Academic English and English for Special Purposes, Email: [redacted] mobile: [redacted].

8.      After receiving this information, law enforcement in Vietnam located the VICTIM and learned that the original report of abuse to the United States Department of State had been made by the VICTIM's mother.

9.      Through their investigation, including the VICTIM's mother's report, law enforcement learned the following:

    a.  The first contact between VICTIM and PARK occurred in early January 2015. During the first encounter, PARK introduced himself to VICTIM as an English language instructor at a park in the vicinity of St. Joseph Cathedral, Hanoi. PARK provided VICTIM with his address and invited VICTIM to his apartment for additional English language instruction.  PARK was reported to reside at 24B Ly Quoc Su, Hanoi.

b.  Approximately two weeks after the first encounter, VICTIM met PARK at his apartment.  VICTIM was accompanied by two friends, both juvenile males.  PARK played a game with the children that involved chasing and grasping each other.  The game occurred within PARK's bedroom and at times on PARK's bed.  During this game clothing of PARK and the boys remained on.

c.  After the game of tag, the boys proceeded to play computer games in PARK's bedroom.  Because the bedroom was narrow, PARK sat in the middle, one boy sat to his left, one boy sat to his right and VICTIM sat on PARK's lap.

d.  While the boys played video games, PARK placed his hand on VICTIM's genitals and then proceeded to "pinch" and then stroke the VICTIM's genitals with his hand outside of the VICTIM's clothing.  PARK told the VICTIM that he "wanted to make him feel good".

e.  PARK then attempted to place his hand inside VICTIM's pants but VICTIM pushed PARK's hand away.

f.  The VICTIM did not believe that any of the other boys were touched while the children played computer games.  The boys departed PARK's apartment following the computer game playing without further physical contact by PARK.  The VICTIM has not had any contact with PARK since the second meeting.

10.  After this information came to light, PARK was deported from Vietnam to Thailand.

6

11.     On November 30, 2015, HSI Bangkok SA Goldman provided HSI SA Tran with information regarding a witness to PARK's criminal activity in Hanoi, Vietnam.  This potential witness, hereinafter referred as "DD", came to the attention of law enforcement officials after he called the United States Embassy in Thailand and stated that he had seen child pornography material on PARK's electronic devices.  DD stated that he had items that belonged to PARK in his house and that he did not want any trouble.

12.     On December 2, 2015, at approximately 3:00 PM, SA Tran and Diplomatic Security Service SA Tom Eckert met with DD at the Hanoi Sheraton Hotel.  DD invited and escorted SA Tran and SA Eckert to his house on 1 Au Co Street, Hanoi, Vietnam.  At the house, the agents met with DD's wife, hereinafter referred as KD, and proceeded to interview the couple. The following information was learned in the interview of DD and KD:

   a.  In 2011, DD and KD were teaching English in Riyadh, Saudi Arabia, where they met PARK and befriended him.

   b.  In the middle of 2013, PARK was asked to leave Saudi Arabia because of his "pedophile" behavior.  DD did not know whether PARK was asked to leave because of something that happened at the school or because of PARK's history.

   c.  After PARK left Saudi Arabia, he went to Vietnam.  Around the same time, DD and KD returned to the United States.  While in the United States, DD and KD kept in regular contact with PARK via email throughout 2014.

d.  In the course of their communications, DD and KD learned that PARK taught English in Hanoi, Vietnam and was also a part time teacher at Hanoi University of Science.

e.  After PARK invited DD and KD to Vietnam to teach English, DD and KD travelled to Vietnam and met with PARK in Hanoi.

f.  While there, in approximately September 2015, PARK showed DD and KD around Hanoi and his apartment located nearby Serendipity Hotel.

g.  After DD and KD moved to Hanoi, PARK provided DD and KD with a key to his apartment.  PARK also gave verbal consent for DD and KD to enter his apartment anytime to use his teaching materials.  In return, DD and KD also provided PARK their house key in case of emergency.  This trust was based on the friendship they developed over years.

h.  According to DD and KD, PARK's apartment was very dirty and not very organized.  It was a two story, one bedroom apartment.  The first floor had a very small kitchen, bathroom, and small living room.  PARK had a Mac Book computer on the coffee table and other electronic devices on the floor in living room.  PARK also had several book cases in the living room.  The second floor was one big bedroom.  DD and KD stated that clothes and books were also on the floor in this bedroom.

i.   On many occasions, DD saw adolescent males at PARK's apartment.  Because of what happened in Saudi Arabia and PARK's behavior around these young males, DD had some concerns when he saw young males inside PARK's apartment.  DD stated that PARK overly hugged these young males and that there were never any females inside PARK's apartment.

j.   In conversation, PARK had told DD that he "likes" boys and "it is difficult for me [PARK] to explain who I fall in love with."  PARK advised DD a website that could explain his behavior but DD could not remember because he was not interested.

k.   After PARK was deported from Vietnam to Thailand, DD kept in contact with PARK, mainly via Skype.

l.   In the course of their communications, PARK asked DD to send him money.  To that end, PARK directed DD to go into his apartment, connect to PARK via video Skype so PARK can show DD where he hid the money.

m.  DD had been inside PARK's apartment, since PARK's deportation, at least fifteen times.  DD believed that PARK's landlord's nephew had moved into PARK's apartment ten days after PARK's deportation and had moved PARK's personal property to one area to have living space for him.

n.   PARK directed DD to go to the upstairs bedroom, locate PARK's jacket, and remove approximately $1,000.00 USD and approximately 4,000,000.00 Vietnam

Dong from the chest pocket.  PARK then directed DD to use the money to purchase a plane ticket to Thailand and to bring a laptop, a bank card, bank documents, vitamins, and left over money to him.

o.  On approximately November 5, 2015, KD flew to Bangkok, Thailand to bring the above items to PARK.  KD could not remember the color of the laptop, but thought it was a light grey color.  KD met PARK inside the Bangkok Airport. PARK told her that he was trying to get back to Vietnam.  PARK stated that he had used two private companies to take care of his visa, but they were not successful.  KD then departed Bangkok on the same date.

p.  On approximately November 28, 2015, acting on PARK's direction, DD and KD went to PARK's apartment to retrieve PARK's personal belongings.  DD and KD removed almost all of PARK's personal belonging except some books and transported them to the fourth floor (laundry room) of DD and KD's house.  The belongings that DD and KD retrieved included PARK's electronic devices, books, papers, clothes, and suitcases.

q.  Because DD was in the process of opening an English school at his home, DD was in need of teaching materials.  DD stated that PARK told DD and KD many times in the past to use his teaching materials in his apartment.  DD believed that PARK may have had teaching materials saved on his electronic devices.

r.   Looking for these teaching materials, DD plugged PARK's USB hub, which had two flash drives attached to it (a black flash drive and a white flash drive with shiny sticker), into his desktop.  DD saw several folders pop up.  DD clicked on one folder which had many movie files.  DD clicked on one movie file.  He could not remember the file name, but positively remembers there was "Boy" on the file title.

s.   The file contained a movie of four adolescent white males, approximately ten to thirteen years old.  DD stated the males were getting in and out of a hot tub; they all had erections; and they did not have pubic hair.

t.   DD then clicked on the second movie file in the same folder.  DD immediately recognized PARK's Mac Book computer on the screen.  The movie was a recording of PARK's Mac Book computer's screen.  The recording appeared to contain Skype video.

u.   The Skype video featured an adolescent male, naked from the waist up, between the ages of ten to thirteen, sitting on a chair.  DD could not hear any sound from the movie, but saw the adolescent male stand up, and walked back to show his whole naked body.

v.   DD stated the adolescent male did not have any pubic hair.  DD could not remember if the adolescent male had an erection. Approximately 40 seconds into the movie, DD stopped the movie.  DD only accessed this movie one time.

11

    w. DD could not remember how many movies were in this folder.  DD also could not remember which of PARK's flash drives contained this folder.  Besides the computer and the flash drive(s), DD did not access any other electronic media devices.

    x. DD recalled that PARK's MacBook computer was pass-code locked as he had seen on the login screen before.  DD and KD saw PARK's flash drives, portable hard drives, and Mac Book computer, but not the USB hub, inside PARK's apartment on many occasions while PARK was still in Hanoi, Vietnam.

13.    In the course of the interview, Agent Tran showed DD and KD three photos.  DD was asked if he recognized anyone in the photos and he positively identified Park in each photo.

14.    DD and KD then took SA Tran and SA Eckert to the fourth floor of their house. They pointed out to the agents PARK's personal belongings, which were collected in the corner of the room and DD showed the agents documents that had PARK's name on them.  DD and KD informed the agents that they were the only two people that have access to this floor.

15.    Agents observed two large suitcases, bags of books, two flash drives attached to an USB hub, one red laptop, one white portable hard drive, one black hard drive, and a large Mac Book.

16.    Agents gathered and removed all of the electronic media devices (collectively "PARK Vietnam Media Devices"), providing DD and KD a copy of the items seized.

17.     Agents took the PARK Vietnam Media Devices to the United States Embassy in Hanoi, Vietnam to label and secured them in SA Eckert's office.

18.     On December 3, 2015, agent Tran retrieved the PARK Vietnam Media Devices and transported them to the HSI office in Ho Chi Minh City where they were secured.

19.     On December 4, 2015, the PARK Vietnam Media Devices were sent to SA Thomas West at Cyber Crime Center for further analysis pending proper court documentation.

20.     Subsequently, the PARK Vietnam Media Devices were transported to the United States Department of Justice, Criminal Division, High Tech Forensic Investigative Unit in Washington, DC.

21.     On January 7, 2016, I secured federal search warrants from Judge Deborah A. Robinson of the U.S. District Court for the District of Columbia for the PARK Vietnam Media Devices.

22.     Initial forensic examination of the PARK Vietnam Media Devices by the High Tech Investigative Unit revealed that at least two of the devices contain images and/or videos that, based on my training and experience, I believe to constitute child pornography.  For example, one of the devices contains multiple video files containing, what I believe to be, prepubescent boys masturbating and at least one video of, what I believe to be, a prepubescent boy being anally penetrated by an adult's penis.

23.     Similarly, the PARK Vietnam Media Devices also contain at least one image of, what I believe to be, child pornography that initial forensic investigation indicates was likely

13

produced by Park using an Apple iPhone (such as the one included in the PARK Incident-to-Arrest Media Devices, which are the subject of the Affidavit).  The metadata within the image indicated it was produced in June 2015.  This image depicts a juvenile male standing on light colored tile.  Moreover, the image does not include the child's face and is concentrated on his genitalia.

24.     On January 7, 2016, PARK was deported by the Thai authorities and boarded Philippines Airlines flight to Manila, Philippines en route to Guam.  HSI agents Goldman observed PARK with two carry-on bags and a small computer as PARK was boarding the flight to Manila.

25.     Later that evening, HSI Guam received information from HSI Manila agent Avilla that PARK arrived at Ninoy Aquino International Airport, Manila, Philippines and attempted to enter the Philippines, but was denied entry by the Philippines Bureau of Immigration.  HSI agent observed PARK in possession of the same carry-on bags as reported by HSI agent Goldman in Bangkok.  For several days, PARK remained in the departure lounge of the Manila airport pending his deportation from the Philippines.

26.     On January 8, 2016, I obtained a Criminal Complaint in the U.S. District Court for the District of Columbia issued by Magistrate Judge Deborah A. Robinson for the offense of 18 U.S.C. 2423(c), Engaging in Illicit Sexual Conduct in a Foreign Place; 18 U.S.C. 2423(e) Attempt to Engage in Illicit Sexual Conduct in a Foreign Place.

27.     On January 13, 2016, PARK was indicted by a Grand Jury in the U.S. District Court for the District of Columbia for the same offense identified in the previously filed criminal complaint.  Specifically, the Indictment contained one count and alleged a violation of 18 U.S.C. 2423(c), Engaging in Illicit Sexual Conduct in a Foreign Place and 18 U.S.C. 2423(e) Attempt to Engage in Illicit Sexual Conduct in a Foreign Place.

28.     On January 14, 2016, PARK was escorted by HSI Manila agents Bortfield and Sampilo on board Philippine Airlines flight to Guam.  Upon PARK's arrival into Guam, he was arrested by HSI agents and the PARK Incident-to-Arrest Media Devices were taken into custody incident to PARK's arrest.  PARK was subsequently transported to Washington, D.C. and arraigned on the Indictment.

29.     On February 12, 2016, Judge Kay of the U.S. District Court for the District of Columbia found PARK to be both a flight risk and a danger to the community and, in accordance with 18 U.S.C. § 3142, detained PARK.  Thus, PARK has remained in custody from the time of his arrest in Guam to the present.

30.     Following PARK's arrest, the PARK Incident-to-Arrest Media Devices were shipped from Guam to the High Tech Investigative Unit in Washington, D.C., where they currently reside.

31.     I know, through my training and experience as well as conversations with other law enforcement agents, that each of the PARK Incident-to-Arrest Media Devices is an electronic device capable of storing data and that the data on these devices could include, among

other things, videos and images of child pornography, identifying data linking the iPhone-produced child pornography found in the PARK Vietnam Media Devices to the PARK Incident-to-Arrest Media Devices that were seized from PARK in Guam, evidence of contact between PARK and the VICTIM and/or between PARK and other minor victims of sexual abuse (including the minors pictured in the child pornography found on the PARK Vietnam Media Devices). The PARK Incident-to-Arrest Media Devices may also contain additional electronic evidence of, among other things, PARK's travel to and from Vietnam during the charged timeframe (such as emailed or stored reservations, itineraries, or receipts), PARK's U.S. citizenship, PARK's grooming and/or sexual abuse of the VICTIM and/or other minor victims, and phone or electronic contact between PARK and the VICTIM and/or other minor victims—including such things as call logs, SMS or text message logs, and, potentially, emails.[1]

32.    I know, through my training and experience as well as conversations with other law enforcement agents, that individuals involved in the sexual abuse of children often record or document the sexual abuse, as well as behaviors and activities associated with or contributing to the sexual abuse, and that this documentation can be either intentional or inadvertent. Examples of documentation may consist of, among other things, photographs or videos of the sexual abuse,

---

[1] Notably, the storage capacity and common use of the PARK Incident-to-Arrest Media Devices varies from device to device. Thus, I believe, that the types of evidence that are likely to be found on each device may vary according to the device's usage and capacity. For example, I believe that the SIM cards are more likely to contain pertinent SMS logs than the laptop computer. Nonetheless, I believe that there is probable cause to believe that each device contains evidence of the above-referenced crimes and/or was an instrumentality of the above-referenced crimes.

writings about the sexual abuse acts or victims (e.g. journals, fantasy stories, communicating

with the victim or communicating with other, like-minded individuals), and evidence of research

regarding techniques, methodologies, and/or opportunities related to sexual abuse (e.g. how to

"groom" a potential victim, opportunities for sexual abuse in foreign countries, laws regarding

sexual abuse of children in various countries, how to establish or join an encrypted, peer-to-peer

file sharing network, techniques to avoid detection or to allay suspicions).

33.    Given the ubiquity of computer media devices and the highly prevalent role that

such devices play in individuals' day-to-day activity, it is unsurprising that, as my training and

experience as well as conversations with other law enforcement agents have indicated, it is

common to find evidence of child sexual abuse—including, for example, evidence of a

relationship between an offender and a victim, evidence of communications between an offender

and a victim, evidence that corroborates a victim's account of an offender's use of computer-

related grooming techniques, evidence that demonstrates an offender's use of computer media to

groom a victim, evidence that confirms an offender's location at the scene of the alleged abuse,

and evidence of an offender's efforts to lure, groom, or maintain potential victims—on an

offender's computer media devices, even if the child-sexual-abuse does not directly involve the

use of computer media.

34.    I also know, through my training and experience as well as conversations with

other law enforcement agents, that individuals who have a sexual interest in children and/or

produce and/or possess images of child pornography collect sexually explicit or suggestive

materials involving children and may maintain those materials in a variety of both electronic and non-electronic (such as photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media) formats.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  When such materials are in an electronic format, individuals who have a sexual interest in children and/or produce and/or possess images of child pornography commonly store these materials on multiple electronic media devices, including seeking to retain such materials on portable electronic media devices that can be kept close at hand.  Indeed, such materials are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the materials, which are valued highly.

35.     Moreover, I know from my training and experience as well as conversations with other law enforcement agents involved in cases that are sometimes described as "child sex tourism", that individuals involved in "child sex tourism" crimes, which are prohibited by such statutes as 18 U.S.C. § 2423(b) and (c) have often been found to supplement their hands-on sexual abuse of children in foreign countries with child-pornography related crimes using computer media.  These crimes may include, include among other things, production of child pornography (either in-person or through webcam), distribution of child pornography, receipt of child pornography, and possession of child pornography.  In such instances, offenders have often been found to use multiple media devices to commit their crimes.

36.     I further know, based on my training and experience as well as conversations with other law enforcement agents and prosecutors involved in cases that are charged under 18 U.S.C. § 2423(b) and (c) and sometimes described as "child sex tourism" cases, that evidence of child-pornography-related crimes has proven to be key to the investigation and ultimate prosecution of "child sex tourism" offenses, including cases involving violations of 18 U.S.C. § 2423(b) and/or (c).  In multiple cases, such evidence has led to the identification of additional minor victims and has be found to reveal specific and uncommon sexual interests or proclivities (such as a sexual preference for hairless, pre-pubescent boys) that corroborates the account and testimony of an offender's minor victim.  Indeed, from these sources, I have learned that evidence of child pornography offenses is often highly valuable, admissible evidence in the prosecution of 18 U.S.C. § 2423(c) cases, as it shows, among other things, a defendant's sexualized interest in children and has been found to be admissible in such prosecutions under, among other things, Federal Rules of Evidence 404 and 414, the latter of which governs the admissibility of evidence of similar crimes in child-molestation cases and allows such evidence to be admitted and considered on "any matter to which it is relevant."

37.     Through my training and experience, as well as conversations with other law enforcement agents involved in child exploitation cases, I have also learned that individuals who produce, distribute, receive, or possess child pornography using computer media devices often transfer child-pornography files from one media device to another.  Thus, I have learned that it is quite common to find that individuals who have stored child pornography on one media device

have also copied, transferred, or stored child pornography on their other media devices.  Indeed, from my training and experience as well as conversations with other law enforcement officer involved in child exploitation offenses, I know that individuals involved in child-exploitation offenses often seek to maintain evidence of their child exploitation crimes on smaller, more portable computer media devices—such as flash drives, external hard drives, smart phones (such as Apple iPhones) and laptop computers—presumably because, among other things, such devices may be more easily hidden or disposed of if the need arises.

## DEFINITIONS/TECHNICAL TERMS

38.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    IP Address:  The Internet Protocol address (or simply "IP") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

20

b.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any adversary that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any

visual depiction of sexually explicit conduct where (a) the production of the visual

depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual

depiction is a digital image, computer image, or computer-generated image that is, or is

indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the

visual depiction has been created, adapted, or modified to appear that an identifiable

minor is engaged in sexually explicit conduct), as well as any visual depiction, the

production of which involves the use of a minor engaged in sexually explicit conduct.

*See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.      "Computer" means "an electronic, magnetic, optical, electrochemical, or

other high speed data processing device performing logical or storage functions, and

includes any data storage facility or communications facility directly related to or

operating in conjunction with such device."  <u>See</u> 18 U.S.C. § 1030(e)(1).

h.      "Computer hardware" means all equipment that can receive, capture,

collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data.  Computer hardware includes any data-processing

devices (including, but not limited to, central processing units, internal and peripheral

storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes,

and other memory storage devices); peripheral input/output devices (including, but not

limited to, keyboards, printers, video display monitors, modems, routers, scanners and

related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

k.      "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

23

l.      "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address.  For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Internet Connection" means a connection required for access to the Internet.  The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o.      "Minor" means any person under the age of eighteen years.  *See* 18 U.S.C. § 2256(1).

p.      A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q.      A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  The router is in turn typically connected to a modem.

r.      "Sexually explicit conduct" means actual or simulated (a) sexual

intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons

of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic

abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18

U.S.C. § 2256(2).

s.      "Visual depictions" include undeveloped film and videotape, and data

stored on computer disk or by electronic means, which is capable of conversion into a

visual image.  See 18 U.S.C. § 2256(5).

t.      "Website" consists of textual pages of information and associated graphic

images.  The textual information is stored in a specific format known as Hyper-Text

Mark-up Language (HTML) and is transmitted from web servers to various web clients

via Hyper-Text Transport Protocol (HTTP).

u.      "Wireless network" as used herein means a system of wireless

communications in which signals are sent and received via electromagnetic waves such

as radio waves.  Each person wanting to connect to a wireless network needs a computer

which has a wireless network card that operates on the same frequency.  Many wired

networks base the security of the network on physical access control, trusting all the users

on the local network.  But, if wireless access points are connected to the network, anyone

in proximity to the network can connect to it.  A wireless access point is equipment that

connects to the modem and broadcasts a signal.  It is possible for an unknown user who

has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v.      "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the computers and/or electronic storage devices described in Attachment A, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive. Thus, the warrant applied for would authorize the seizure of electronically stored files or data, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.     *Probable Cause.* Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic

examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be on the computer and electronic storage devices described in Attachment A for at least the following reasons:

a.      Based on my training and experience, as well as my discussions with others involved in child exploitation investigations, I know that computers and computer technology have revolutionized the way in which child exploitation offenses are committed.

b.      Individuals who engage in child exploitation offenses, including travelling in foreign commerce and engaging in illicit sexual conduct in violation of 18 United States Code Sections 2423 (c) and (e), use the internet and computers to allow them to obtain child exploitation material and/or child-exploitation-related materials in a relatively secure and anonymous way.  Individuals who have a sexual interest in children often maintain their child exploitation material and/or child-exploitation-related materials in a digital or electronic format in a safe, secure and private environment, such as a computer.  These materials are often maintained for several years and are kept close by. Individuals with a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other individual interested in child exploitation material and/or child-exploitation-related materials; conceal such correspondence as they do their child exploitation material and/or child-exploitation-related materials; and often maintain lists

28

of names, addresses, and telephone numbers of individuals with whom they have been in

contact and who share the same interests in child exploitation.

        c.      Individuals who engage in the foregoing criminal activity, in the event that

they change computers, will often "back up" or transfer files from their old computers'

hard drives to that of their new computers, so as not to lose data, including that described

in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        d.      Computer files or remnants of such files can be recovered months or even

years after they have been downloaded onto an electronic storage medium, deleted, or

viewed via the Internet.  Electronic files downloaded to an electronic storage medium can

be stored for years at little or no cost.  Even when such files have been deleted, they can

be recovered months or years later using readily-available forensics tools.  When a person

"deletes" a file on a digital device such as a home computer, the data contained in the file

does not actually disappear; rather, that data remains on the electronic storage medium

until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files,

may reside in free space or slack space – that is, in space on the electronic storage

medium that is not allocated to an active file or that is unused after a file has been

allocated to a set block of storage space – for long periods of time before they are

overwritten.  In addition, a digital device's operating system may also keep a record of

deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the

Internet are automatically downloaded into a temporary Internet directory or "cache."

The browser typically maintains a fixed amount of electronic storage medium space

devoted to these files, and the files are only overwritten as they are replaced with more

recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file

from an electronic storage medium depends less on when the file was downloaded or

viewed than on a particular user's operating system, storage capacity, and computer,

smart phone, or other digital device habits.

41.     *Forensic Evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronic evidence or information that might serve as direct

evidence of the crimes described on the warrant, but also for forensic electronic evidence or

information that establishes how electronic storage media or digital devices were used, the

purpose of their use, who used them, and when.  Based on my knowledge, training, and

experience, as well as information related to me by agents and others involved in this

investigation and in the forensic examination of digital devices, I respectfully submit there is

probable cause to believe that this forensic electronic evidence and information will be on the

computer and electronic storage devices because:

a.      Although some of the records called for by this warrant might be found in

the form of user-generated documents or records (such as word processing, picture,

movie, or texting files), digital devices can contain other forms of electronic evidence as

well.  In particular, records of how a digital device has been used, what it has been used

for, who has used it, and who has been responsible for creating or maintaining records,

documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregated from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage media that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

42.     *Methods To Be Used To Search Digital Devices.*   Based on my knowledge,

training, and experience, as well as information related to me by agents and others involved in

this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often

requiring specific expertise, specialized equipment, and substantial amounts of time.

There are so many types of digital devices and software programs in use today that it is

impossible to bring to the search site all of the necessary technical manuals, specialized

equipment, and software programs necessary to conduct a thorough search.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage

devices – may be customized with a vast array of software applications, each generating a

particular form of information or records and each often requiring unique forensic tools,

techniques, and expertise.  As a result, it may be necessary to consult with specially

trained personnel who have specific expertise in the types of digital devices, operating

systems, or software applications that are being searched, and to obtain specialized

hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise,

scientific procedures that are designed to maintain the integrity of digital data and to

recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery

of "residue" of electronic files from electronic storage media also requires specialized

34

tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.  Smart phones capable of storing 128 gigabytes, flash drives capable of storing 128 gigabytes, and desktop computers capable of storing a terabyte are now commonplace.  Consequently, just one device might contain enormous amounts of data.

d.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

e.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps"

that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

f.      Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.      In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as

circumstances warrant.  Such techniques may include, but shall not be limited to,

surveying various file "directories" and the individual files they contain

(analogous to looking at the outside of a file cabinet for the markings it contains

and opening a drawer believed to contain pertinent files); conducting a file-by-file

review by "opening," reviewing, or reading the images or first few "pages" of

such files in order to determine their precise contents; "scanning" storage areas to

discover and possibly recover recently deleted data; scanning storage areas for

deliberately hidden files; and performing electronic "keyword" searches through

all electronic storage areas to determine whether occurrences of language

contained in such storage areas exist that are related to the subject matter of the

investigation.

2.      In searching the seized electronic storage media or digital devices,

the forensic examiners may examine as much of the contents of the electronic

storage media or digital devices as deemed necessary to make a determination as

to whether the contents fall within the items to be seized as set forth in

Attachment B.  In addition, the forensic examiners may search for and attempt to

recover "deleted," "hidden," or encrypted data to determine whether the contents

fall within the items to be seized as described in Attachment B.  Any search

techniques or protocols used in searching the contents of the seized electronic

storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

## **CONCLUSION**

43.     Based on the above information, there is probable cause to believe that the records and information described in Attachment B will be on the PARK Incident-to-Arrest Media Devices (Samsung Laptop Computer, S/N: ZX5293PB900371F; Apple iPhone, S/N: C39GLAA3DTDT, IMEI: 013008002019469; Seventeen Loose SIM Cards) in violation of Title 18, United States Code, Sections 2251 and 2252, which prohibit, among other things, the production, transportation, and possession of what is commonly referred to as child pornography, as well as Section 2423 (c) and (e), which make it a federal crime for any person to travel in foreign commerce and engage in illicit sexual conduct or to attempt the same.

44.     Based upon the foregoing, I respectfully request that this Court issue a search warrant for the computer and electronic storage devices described in Attachment A.

Respectfully submitted,

_____

Kristina M. Eyler
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on March 21, 2016:

_____

The Honorable G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE